UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>(1) GYULNARA BAYRYSHOVA, )<br>(2) SLAVA PRIDE, )<br>(3) ANNA BARENBOYM and )<br>(4) RAYA BAGARDI )<br><br>Defendants | Criminal No.   21cr10041<br><br>Violations:<br><br>Count One: Conspiracy to Commit Mail Fraud and<br>Health Care Fraud<br>(18 U.S.C. § 1349)<br><br>Counts Two - Nine: Mail Fraud; Aiding and Abetting<br>(18 U.S.C. §§ 1341 and 2)<br><br>Count Ten: Health Care Fraud; Aiding and Abetting<br>(18 U.S.C. §§ 1347 and 2)<br><br>Counts Eleven - Nineteen: False Statements in<br>Connection with Health Care Benefit Programs<br>(18 U.S.C. § 1035)<br><br>Forfeiture Allegations:<br>(18 U.S.C. §§ 981(a)(1)(C), 982(a)(1) and<br>28 U.S.C. § 2461(c)) |

INDICTMENT

At times relevant to this indictment:

General Allegations

1.     Defendant, GYULNARA BAYRYSHOVA ("BAYRYSHOVA"), was a resident

of Brighton, Massachusetts. BAYRYSHOVA was the president, treasurer, secretary, director, and

registered agent for Brighton Physical Therapy Center, Inc. ("BPT"), a provider of physical

therapy services, with a principal place of business at 320 Washington Street, Suite 315, Brighton,

Massachusetts. BAYRYSHOVA was licensed with the Massachusetts Division of Professional

Licensure as a Massage Therapist Practitioner. BAYRYSHOVA was not licensed to perform physical therapy.

2.      Defendant SLAVA PRIDE ("PRIDE") was an individual who resided in West Roxbury, Massachusetts. PRIDE was a licensed physical therapist assistant employed by BPT.

3.      Defendant RAYA BAGARDI ("BAGARDI") was an individual who resided in Brighton, Massachusetts. RAYA BAGARDI was a licensed physical therapist assistant employed by BPT.

4.      Defendant ANNA BARENBOYM ("BARENBOYM") was an individual who resided in Wayland, Massachusetts. BARENBOYM was a licensed physical therapist employed by BPT.

5.      Insurance Company 1 was a health care benefit program within the meaning of 18 U.S.C. § 24, in that it was a private plan and contract, affecting commerce, under which medical benefits, items and services were provided and for which payment was made under the plan and contract.

6.      BPT was a business that purported to provide physical therapy services to patients with minor injuries generally sustained in automobile accidents. These services were typically paid for by private insurance companies, including Insurance Company 1.

7.      Business 1 was a business engaged in medical billing and prepared bills for BPT based on BPT's patient progress notes and physician and/or physical therapist evaluations for submission to Insurance Company 1. The owners of Business 1 previously owned BPT.

Physical Therapy Insurance Claims

8.      In the normal course of legitimate physical therapy treatment, a physical therapist and/or a doctor conducts an initial evaluation of a new patient. In this initial evaluation, the

2

physical therapist and/or the doctor notes the injured areas of the patient, and prescribes necessary treatments, such as hot packs, stretches, or exercise.

9.     The patient is often referred to a physical therapy assistant, who typically sees the patient one to three times a week for the duration of the treatments and actually performs the treatments on the patient.

10.     During an encounter with a patient, providers routinely complete notes of the patient visit, commonly referred to as patient progress notes. These notes are signed and dated by the person performing the treatment. These notes are essential for an insurance carrier to evaluate a patient's condition, any diagnosis of the condition, any treatment rendered by the provider and to determine whether treatment is medically necessary. It is standard for insurance companies to refuse to pay claims for medical services which are not properly supported by documentation in the patient progress notes or elsewhere.

11.     When medical providers submit claims for medical services to insurance plans, the claims are submitted using the Physicians' Current Procedural Terminology ("CPT") code book, which is published annually by the American Medical Association. The CPT code book assigns a five-digit code to each medical procedure or diagnosis. Providers bill each service using the CPT code corresponding to the medical service provided to the patient. Physical therapy facilities will frequently bill for medical services such as massage therapy, electrical stimulation, and the use of hot and cold packs.

12.     Physical therapy facilities and other medical service providers generally submit claims for services rendered, including the individual CPT code for each service, to insurance companies using the Health Insurance Claim Form ("HICF") Form 1500, either in paper or electronic form. A HICF Form 1500 contains a certification by the provider that incorporates the

3

statements on the back of the form. The back of the Form 1500 contains the following certification (in sum and substance):

> I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

13.     As described above, when a patient begins physical therapy, a physical therapist and/or doctor conducts an initial evaluation.   The results of the evaluation are documented in a medical report termed, "Initial Evaluation."  Approximately every thirty days, a physical therapist generally conducts a re-evaluation and documents the results in a medical report termed, "Re-Evaluation."  When the anticipated goals and expected outcomes of the physical therapy have been achieved, a patient is discharged and the results of the discharge are documented in a medical report termed, "Discharge."

14.     In accordance with this procedure, BPT faxed their patient progress notes and physician and/or physical therapist evaluations to Business 1.  Business 1, in turn, generated HICF Forms 1500 on behalf of BPT and sent those forms to Insurance Company 1 by utilizing the United States mail.  Insurance Company 1 reviewed the HICF forms and, when appropriate, authorized payments, usually in the form of a bank check, to be issued to BPT, generally utilizing the U.S. mail.

15 .     Under Massachusetts law, an individual injured in a car accident ("plaintiff") is entitled to have medical expenses, lost wages, and pain and suffering immediately paid out of their automobile insurance policy through the Personal  Injury  Protection ("PIP") benefit of the automobile policy. PIP coverage is mandated by Massachusetts law and requires coverage of at least $8,000.  Under the PIP, it is routine for treating medical providers to bill the plaintiff's insurance carrier for automobile-related medical bills.

16.     Physical therapy is reimbursable under Massachusetts automobile insurance policies if administered or supervised by appropriately licensed physical therapy providers, including licensed physical therapists and physical therapy assistants.

### Overview of the Conspiracy and Scheme to Defraud

17.     Beginning no later than October 25, 2018 and continuing thereafter through at least on or about June 17, 2020, BAYRYSHOVA, PRIDE, BARENBOYM, and BAGARDI conspired to defraud Insurance Company 1 and to obtain money and property from Insurance Company 1 by submitting false and fraudulent claims for medical services that were not rendered and/or not medically necessary.

### Object and Purpose of the Conspiracy and Scheme to Defraud

18.     The objects of the conspiracy were to commit mail fraud and health care fraud by submitting false and fraudulent claims to Insurance Company 1. The purpose of the conspiracy and scheme to defraud was to enrich the defendants personally.

### Manner and Means of the Conspiracy and Scheme to Defraud

19.     Among the manner and means by which defendants and coconspirators known and unknown to the Grand Jury carried out the conspiracy and the scheme to defraud were the following:

> a.      Falsifying Initial Evaluations to make a patient's injuries seem worse than they really were;
>
> b.      Falsifying patient progress notes and evaluations to include medical services not rendered to patients;
>
> c.      Falsifying patient progress notes and evaluations to make it appear that medical services were provided by appropriately licensed therapists or

assistants;

d.      Providing medical services to patients that were not medically necessary, including after patients indicated they no longer required treatment;

e.      Submitting falsified patient notes and/or evaluations to Insurance Company 1 for payment;

f.      Submitting patient notes and evaluations that contained medically unnecessary treatments to Insurance Company 1 for payment; and

g.      Providing kickbacks to patients who referred new patients to BPT.

Acts in Furtherance of the Conspiracy and Scheme to Defraud

20.     Defendants and coconspirators known and unknown to the Grand Jury committed or caused to be committed the following acts in furtherance of the conspiracy and scheme to defraud.

21.     On or about October 25, 2018, a confidential human source  ("CHS"), met with SD, an employee of BPT, and BAYRYSHOVA, and told them that CHS had injured CHS's neck in a car accident.  BAYRYSHOVA agreed to treat CHS and instructed CHS to return in a few hours to meet with an attorney and physical therapist.

22.     From October 25, 2018 to February 20, 2019, the CHS visited BPT on twenty-four occasions to receive physical therapy.

23.     On all occasions where CHS was treated by BPT, he did not receive the treatment that was billed by BPT to Insurance Company 1.  For instance, on almost all occasions where CHS was treated by PRIDE, the CHS received only fifteen minutes of electrical stimulation ("eStim") and no other treatment.  Nonetheless, PRIDE indicated in his patient progress notes that he performed additional medical services and BPT billed Insurance Company 1 for those services.

24.     On the few occasions where the CHS was treated by defendant BAGARDI, the CHS received only fifteen minutes of eStim with heat and was shown how to do strengthening exercises. Nonetheless, BAGARDI's patient progress notes indicate that she performed additional medical services that were not performed and BPT billed Insurance Company 1 for those services.

25.     On or about November 14, 2018, the CHS told BAYRYSHOVA that the CHS no longer had neck pain. BAYRYSHOVA told the CHS that the CHS needed to continue his physical therapy treatments to make a strong case.

26.     On or about November 27, 2018, the CHS had a re-evaluation by BARENBOYM. The CHS told BARENBOYM that the CHS no longer had neck pain. Despite this, BARENBOYM told the CHS that the CHS should have more physical therapy.  The CHS continued to attend physical therapy appointments, including one where CHS received no treatment.

27.     Insurance Company 1's billing records indicate that for the physical therapy performed by BPT on the CHS, BARENBOYM materially misrepresented and exaggerated the injury sustained by CHS, especially in her notes and observations of CHS during the November 27, 2018 re-evaluation.

28.     In addition, although the CHS sought no treatment from BPT on January 2, 2019, BPT billed Insurance Company 1 for a re-evaluation, supposedly performed by defendant BARENBOYM  and eStim treatment along with a hot/cold modality by PRIDE.

29.     On or about January 30, 2020, the CHS introduced a Federal Bureau of Investigation ("FBI") undercover employee ("UCE") to BAYRYSHOVA and BARENBOYM. The UCE told BAYRYSHOVA and BARENBOYM that the UCE suffered neck injuries due to a car accident. The UCE was instructed to fill out paperwork and referred to Attorney 1. While the UCE was being treated, BAYRYSHOVA told the CHS that she would pay the CHS for referring

7

the UCE to BPT. BARYRYSHOVA further told the CHS that she would provide the CHS with a referral fee for anyone else the CHS brought to BPT for treatment.

30.     From on or about January 30, 2020 until on or about March 19, 2020, the UCE visited BPT on seventeen occasions and received treatment on sixteen of those occasions.

31.     On or about May 5, 2020, the UCE went to BPT and told BARENBOYM that the UCE was feeling fine. BARENBOYM asked the UCE if the UCE had any pain and the UCE said no. BAYRYSHOVA stated that they would discharge the UCE and the UCE asked if it would be good for the UCE"s case. After some back and forth between BAYRYSHOVA and BARENBOYM, where BAYRYSHOVA was gesturing to her neck and back while the UCE talked, the UCE was directed by BARENBOYM to keep coming for treatment.

32.     In total, from January 30, 2020 through June 17, 2020, the UCE visited BPT on approximately twenty-eight occasions. The UCE received treatment on twenty-six of the twenty-eight visits. On almost all occasions where the UCE was treated by PRIDE, the UCE received only fifteen minutes of eStim and no other treatment and was told to ride the bike for a few minutes. Most times, PRIDE did not inquire with the UCE about how the UCE was feeling. On the occasions when the UCE was treated by BAGARDI, the UCE received only eStim and heat. BAYRYSHOVA treated the UCE on six occasions. On one occasion, BAYRYSHOVA showed the UCE how to do exercises and on another she had the UCE do some neck stretching.

33.     During UCE's treatment at BPT, BAGARDI and BARENBOYM submitted falsified medical records to Business 1 (for the purpose of billing Insurance Company 1) alleging in UCE's patient progress notes and medical reports that a licensed medical professional had provided the services, when, in fact, some of the services were performed by BAYRYSHOVA, who is not licensed by the Commonwealth of Massachusetts as a doctor, physical therapist, or

8

physical therapist assistant.

34.     Also during that time period, BARENBOYM, BAGARDI, and PRIDE submitted falsified medical records to Business 1 (for the purpose of billing Insurance Company 1) alleging in UCE's patient progress notes and medical reports that treatments were performed when they were not. For instance, BPT billed Insurance Company 1 for a physical therapy re-evaluation of the UCE on June 9, 2020 supposedly performed by BARENBOYM. Although the UCE went to BPT on June 9, 2020, BARENBOYM was not present and the UCE was not re-evaluated by anyone. On the UCE's final day at BPT, the UCE did not receive any treatment or any examination by BARENBOYM who was not in the office that day. Nonetheless, BARENBOYM wrote up patient progress notes as if the UCE received a re-valuation and three treatment modalities that were subsequently billed to Insurance Company 1.

35.     Similarly, during the same time period, billing records from Insurance Company 1 indicate that BARENBOYM made material misrepresentations (or caused such misrepresentations) and exaggerated the injury sustained by the UCE.

36.     On or about September 8, 2020, the CHS traveled to BPT and met with BAYRYSHOVA. The CHS asked BAYRYSHOVA if the UCE had finished treatment and if the CHS could get rewarded for referring the UCE to BPT. BAYRYSHOVA told the CHS that the UCE asked a lot of questions. She told CHS she would call the CHS later.

37.     On or about September 17, 2020, BAYRYSHOVA called the CHS and told the CHS to come to BPT. The CHS went to BPT where SD handed the CHS a sealed envelope and said, "This is for the repairs." The CHS took the envelope, which contained $500 in United States currency, and left.

38.     Based on the false and fraudulent records that the defendants provided to Insurance

9

Company 1, through Business 1, in support of services purportedly rendered by BPT to the CHS and UCE, BPT received the following insurance payment checks by mail. BAYRYSHOVA caused those checks to be endorsed and deposited into BPT's bank account, which BAYRYSHOVA controlled.

| Check | Patient | Check Date | Check Number | Check Amount |
|-------|---------|------------|--------------|--------------|
| 1 | CHS | 1/25/2019 | 5410291157 | $3,457.00 |
| 2 | CHS | 2/19/2019 | 5410298021 | $1,124.00 |
| 3 | CHS | 3/6/2019 | 5410302590 | $686.00 |
| 4 | CHS | 3/28/2019 | 5410309160 | $628.00 |
| 5 | UCE | 4/8/2020 | 5410385100 | $1,807.92 |
| 6 | UCE | 4/7/2020 | 5410384894 | $548.70 |
| 7 | UCE | 6/26/2020 | 5510028465 | $345.96 |
| 8 | UCE | 8/3/2020 | 5510029889 | $1,194.12 |

39.     On or about October 14, 2020, based on the false and fraudulent records provided to them by BPT in support of services purportedly rendered to the UCE, Insurance Company 1 mailed a check to Attorney 1 in the amount of $10,000 for settlement of the UCE's purported auto accident claim.

40.     On or about October 14, 2020, Attorney 1 wrote a check from his IOLTA account to East Boston Physical Therapy, a related physical therapy location, in the amount of $750.00. The memorandum section of the check states, "S. Tavares outstanding meds." (S. Tavares was the fictional name of the UCE.) The check was thereafter deposited into BPT's operating account.

41.     On or about October 20, 2020, the UCE received a check from Attorney 1 in the amount of $6,007.67 for settlement of his auto accident claim.

42.     Had Insurance Company 1 known that BPT was submitting false and fraudulent claims for medical services, it would have denied the claims and discounted the significance given

10

to any submissions in any insurance settlement.

<u>False Statements in Connection with Health Care Benefit Program</u>

43.     On November 7, 2018, Pride treated the CHS with E-stim at BPT.  In the Patient Progress Notes, Pride wrote, "Pt. reports doing HEP daily" and put check marks next to "Hot Pack," "E-stim," "Therapeutic Exercises (see flow sheet)," and "Functional Activities (1:1 Activity)".  On the corresponding "Exercise Sheet," Pride placed twelve check marks next to various exercises.  The CHS did not report to Pride that the CHS was doing a home exercise program daily.  The CHS did not receive a hot pack, instruction and/or direction on therapeutic exercises, and did not participate in functional activities.

44.     On December 12, 2018, the CHS went to BPT but did not receive any treatment. In the Patient Progress Notes, Pride wrote, "Pt. reports doing HEP daily" and put check marks next to "Hot Pack", "E-stim", "Therapeutic Exercises (see flow sheet)", and "Functional Activities (1:1 Activity)".  On the corresponding "Exercise Sheet," Pride placed twelve check marks next to various exercises.  The CHS did not report to Pride that the CHS was doing a home exercise program daily.  The CHS did not receive a hot pack, instruction and/or direction on therapeutic exercises, and did not participate in functional activities.

45.     On January 2, 2019, the CHS did not go to BPT.  In the Patient Progress Notes, Pride wrote, "See Re-eval" and put check marks next to "Hot Pack" and "E-stim".

46.     On January 2, 2019, the CHS did not go to BPT.  Barenboym wrote up a Physical Therapy Reevaluation as if she had seen the CHS that day. The Reevaluation form included notes that indicated Barenboym physically examined the CHS and conducted testing to include range of motion and strength tests.  Barenboym also signed a Medical Record Certification that stated in part, "…that this record is a true, accurate and complete record of the reasonable and

necessary medical services rendered to [the CHS] pertaining to injuries sustained on 10/20/18."

47.   On June 9, 2020, the UCE went to BPT and received a hot pack from Bayryshova. Barenboym was not at BPT that day.  Barenboym wrote up a Physical Therapy Reevaluation as if she had seen the UCE that day. The Reevaluation form included notes that indicated Barenboym physically examined the UCE and conducted testing to include range of motion and strength tests.

48.   On June 17, 2020, the UCE went to BPT and received no treatment.  Barenboym was not at BPT that day.  Barenboym wrote up a Physical Therapy Discharge Summary as if she had seen the UCE that day.  The Discharge Summary form included notes that indicated Barenboym physically examined the UCE and conducted testing to include range of motion and strength tests.  She also signed a Medical Record Certification that stated in part, "…that this record is a true, accurate and complete record of the reasonable and necessary medical services rendered to [the UCE] pertaining to injuries sustained on 01/29/20." Barenboym also wrote in the Patient Progress notes that the UCE said, "Overall better" and put check marks next to "Hot Pack", "Therapeutic Exercises (see flow sheet)", and "Functional Activities (1:1 Activity)".  On the corresponding "Exercise Sheet" Barenboym placed eleven check marks next to various exercises.

49.   On May 5, 2020, the UCE went to BPT and received a hot pack from Bayryshova. Bagardi was not at BPT that day.  In the Patient Progress Notes, Bagardi wrote, "Better than last time" and put check marks next to "Hot Pack," "Therapeutic Exercises (see flow sheet)," and "Functional Activities (1:1 Activity)".  On the corresponding "Exercise Sheet," Bagardi placed eight check marks next to various exercises.

50.   On May 19, 2020, the UCE went to BPT and was directed to do exercises by

Bayryshova. At the conclusion of the exercises, Bayryshova put a hot pack on the UCE's shoulder. Bagardi came in towards the end of the UCE's treatment and asked if the CHS was done with treatment. In the Patient Progress Notes, Bagardi wrote, "Still improving, happy" and put check marks next to "Hot Pack," "E-stim," "Therapeutic Exercises (see flow sheet)," and "Functional Activities (1:1 Activity)". On the corresponding "Exercise Sheet," Bagardi placed eight check marks next to various exercises. The UCE did not say that the UCE was "still improving" and was not treated with electrical stimulations, only did neck stretching but not exercise, and did not participate in functional activities.

51.     On May 26, 2020, the UCE went to BPT and received a hot pack from Bayryshova, and afterward was directed by her to sit in a massage chair. Bagardi was not at BPT that day. In the Patient Progress Notes, Bagardi put check marks next to "Hot Pack," "E-stim," "Therapeutic Exercises (see flow sheet)," and "Functional Activities (1:1 Activity)". Bagardi did not provide treatment that day, the UCE did not receive electrical stimulations, and was not instructed to do exercises or functional activities.

COUNT ONE
Conspiracy to Commit Mail Fraud and Health Care Fraud
(18 U.S.C. § 1349)

The Grand Jury charges:

52.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-51 of this

Indictment.

53.     Beginning no later than on or about October 25, 2018 through at least on or about

June 17, 2020, in Suffolk County and elsewhere in the District of Massachusetts, the defendants,

      (1)  GYULNARA BAYRYSHOVA,
      (2)  SLAVA PRIDE,
      (3)  ANNA BARENBOYM, and
      (4)  RAYA BAGARDI,

conspired with each other and with others known and unknown to the Grand Jury to commit the

following offenses:

a.      mail fraud, that is, having devised and intending to devise a scheme and artifice to

defraud, and for obtaining money and property by means of materially false and

fraudulent pretenses, representations, and promises, did, for the purpose of

executing and attempting to execute the scheme, knowingly cause to be delivered

by mail and by any private and commercial interstate carrier according to the

direction thereon, any matter and thing, in violation of Title 18, United States Code,

Section 1341; and

b.      health care fraud, that is, to knowingly and willfully execute a scheme and artifice

to defraud a health care benefit program, as defined in Title 18, United States Code,

Section 24(b), to wit, Insurance Company 1, and to obtain money and property

owned by and under the custody and control of Insurance Company 1, by means of

materially false and fraudulent pretenses, representations, and promises, in

14

connection with the delivery of and payment for health care benefits, items and services, in violation of Title 18, United States Code, Section 1347.

All in violation of Title 18, United States Code, Section 1349.

COUNTS TWO – NINE
Mail Fraud; Aiding and Abetting
(18 U.S.C. §§ 1341 and 2)

The Grand Jury further charges:

54.     The Grand Jury re-alleges and incorporates by reference Paragraphs 1 - 51 of this Indictment.

55.     On or about the dates set forth below, in Suffolk County and elsewhere in the District of Massachusetts, the defendants,

        (1) GYULNARA BAYRYSHOVA,
        (2) SLAVA PRIDE,
        (3) ANNA BARENBOYM, and
        (4) RAYA BAGARDI,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did, for the purpose of executing and attempting to execute the scheme, knowingly cause to be delivered by mail and by any private and commercial interstate carrier according to the direction thereon, the following:

| Count | Patient | Insurance Co. | Check Date | Check Number | Check Amount |
|---|---|---|---|---|---|
| 2 | CHS | Insurance Co. 1 | 1/25/2019 | 5410291157 | $3,457.00 |
| 3 | CHS | Insurance Co. 1 | 2/19/2019 | 5410298021 | $1,124.00 |
| 4 | CHS | Insurance Co. 1 | 3/6/2019 | 5410302590 | $686.00 |
| 5 | CHS | Insurance Co. 1 | 3/28/2019 | 5410309160 | $628.00 |
| 6 | UCE | Insurance Co. 1 | 4/8/2020 | 5410385100 | $1,807.92 |
| 7 | UCE | Insurance Co. 1 | 4/7/2020 | 5410384894 | $548.70 |
| 8 | UCE | Insurance Co. 1 | 6/26/2020 | 5510028465 | $345.96 |
| 9 | UCE | Insurance Co. 1 | 8/3/2020 | 5510029889 | $1,194.12 |

All in violation of Title 18, United States Code, Sections 1341 and 2.

COUNT TEN
Health Care Fraud; Aiding and Abetting
(18 U.S.C. §§ 1347 and 2)

The Grand Jury further charges:

56.     The Grand Jury re-alleges and incorporates by reference Paragraphs 1 - 51 of this Indictment.

57.     Beginning no later than on or about October 25, 2018 through at least on or about June 17, 2020, in Suffolk County and elsewhere in the District of Massachusetts, the defendants,

(1) GYULNARA BAYRYSHOVA,
(2) SLAVA PRIDE,
(3) ANNA BARENBOYM, and
(4) RAYA BAGARDI,

knowingly and willfully executed a scheme and artifice to defraud a health care benefit program, as defined in Title 18, United States Code, Section 24(b), that is, Insurance Company 1, and to obtain money and property owned by and under the custody and control of Insurance Company 1, by means of materially false and fraudulent pretenses, representations, and promises, in connection with the delivery of and payment for health care benefits, items and services.

All in violation of Title 18, United States Code, Sections 1347 and 2.

COUNTS ELEVEN - THIRTEEN
False Statements in Connection with Health Care Benefit Programs
(18 U.S.C. § 1035)

The Grand Jury further charges:

58.     The Grand Jury re-alleges and incorporates by reference Paragraphs 1 - 51 of this

Indictment.

59.     On or about the dates set forth below, in Suffolk County, in the District of

Massachusetts, the defendant,

(2)  SLAVA PRIDE,

knowingly and willfully made a materially false, fictitious, and fraudulent statement and

representation in connection with the delivery of and payment for health care benefits, items and

services involving a health care benefit program as defined in 18 U.S.C. § 24(b):

| Count | Date of Treatment | Patient | Form(s) at Issue | Health Care Benefit Program |
|-------|-------------------|---------|------------------|------------------------------|
| 11 | 11/7/2018 | CHS | As stated in Para. 43. | Insurance Co. 1 |
| 12 | 12/12/2018 | CHS | As stated in Para. 44. | Insurance Co. 1 |
| 13 | 1/2/2019 | CHS | As stated in Para. 45. | Insurance Co. 1 |

All in violation of Title 18, United States Code, Section 1035(a).

COUNTS FOURTEEN - SIXTEEN
False Statements in Connection with Health Care Benefit Programs
(18 U.S.C. §1035)

The Grand Jury further charges:

60.    The Grand Jury re-alleges and incorporates by reference Paragraphs 1 - 51 of this

Indictment.

61.    On or about the dates set forth below, in Suffolk County, in the District of

Massachusetts, the defendant,

(3) ANNA BARENBOYM,

knowingly and willfully made a materially false, fictitious, and fraudulent statement and

representation in connection with the delivery of and payment for health care benefits, items and

services involving a health care benefit program as defined in 18 U.S.C. § 24(b):

| Count | Date of Treatment | Patient | Form(s) at Issue | Health Care Benefit Program |
|-------|-------------------|---------|------------------|------------------------------|
| 14 | 1/2/2019 | CHS | As stated in Para. 46. | Insurance Co. 1 |
| 15 | 6/9/2020 | UCE | As stated in Para. 47. | Insurance Co. 1 |
| 16 | 6/17/2020 | UCE | As stated in Para. 48. | Insurance Co. 1 |

All in violation of Title 18, United States Code, Section 1035(a).

## COUNTS SEVENTEEN-NINETEEN
False Statements in Connection with Health Care Benefit Programs
(18 U.S.C. § 1035)

The Grand Jury further charges:

62.     The Grand Jury re-alleges and incorporates by reference Paragraphs 1 - 51 of this Indictment.

63.     On or about the dates set forth below, in Suffolk County, in the District of Massachusetts, the defendant,

(4)  RAYA BAGARDI,

knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation in connection with the delivery of and payment for health care benefits, items and services involving a health care benefit program as defined in 18 U.S.C. § 24(b):

| Count | Date of Treatment | Patient | Form(s) at Issue | Health Care Benefit Program |
|-------|-------------------|---------|------------------|------------------------------|
| 17 | 5/5/2020 | UCE | As stated in Para. 49. | Insurance Co. 1 |
| 18 | 5/19/2020 | UCE | As stated in Para. 50. | Insurance Co. 1 |
| 19 | 5/26/2020 | UCE | As stated in Para. 51. | Insurance Co. 1 |

All in violation of Title 18, United States Code, Section 1035(a).

FORFEITURE ALLEGATION
(18 U.S.C. §§ 981(a)(1)(C), 982(a)(7), and 28 U.S.C. § 2461(c))

64.     Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 1341, 1347, 1349, 1035 and 2 set forth in Counts One through Nineteen, the defendants,

(1)  GYULNARA BAYRYSHOVA,
(2)  SLAVA PRIDE,
(3)  ANNA BARENBOYM, and
(4)  RAYA BAGARDI

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses and, pursuant to title 18, United States Code, Section 982(a)(7), any property, real or person, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses. .

65.     If any of the property described in Paragraph 1, above, as being forfeitable pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

      a.  cannot be located upon the exercise of due diligence;

      b.  has been transferred or sold to, or deposited with, a third party;

      c.  has been placed beyond the jurisdiction of the Court;

      d.  has been substantially diminished in value; or

      e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), both incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the

21

property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7) , and

Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON OF THE GRAND JURY

LAURA J. KAPLAN
ASSISTANT U.S. ATTORNEY

DISTRICT OF MASSACHUSETTS, ___ February 3, 2021

Returned into the District Court by the Grand Jurors and filed.

/s/ Harold Putnam  2/3/2021; 1:20 p.m.

DEPUTY CLERK

HON. MARIANNE B. BOWLER
United States Magistrate Judge

22